IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division

| | | |
|---|---|---|
| FRANCINE G.,[1] | ) | |
| Plaintiff, | ) | Civil Action No. 4:20-cv-00072 |
| | ) | |
| v. | ) | REPORT & RECOMMENDATION |
| | ) | |
| KILOLO KIJAKAZI, | ) | By:    Joel C. Hoppe |
| Acting Commissioner of Social Security, | ) | United States Magistrate Judge |
| Defendant.[2] | ) | |

Plaintiff Francine G. asks this Court to review the Commissioner of Social Security's

final decision denying her application for disability insurance benefits ("DIB") under Title II of

the Social Security Act (the "Act"), 42 U.S.C. §§ 401–434. The case is before me by referral

under 28 U.S.C. § 636(b)(1)(B). Having considered the administrative record, the parties' filings,

and the applicable law, I find that substantial evidence supports the Commissioner's denial of

benefits. Accordingly, I respectfully recommend that the presiding District Judge affirm the

decision.

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. 42 U.S.C. § 405(g); *see also Hines v.*

*Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not

"reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for

that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, a court

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the
United States has recommended that, due to significant privacy concerns in social security cases, federal
courts should refer to claimants only by their first names and last initials.

[2] Acting Commissioner Kijakazi is hereby substituted as the named defendant in this action. 42 U.S.C. §
405(g); Fed. R. Civ. P. 25(d).

reviewing the merits of the Commissioner's final decision asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 98–100 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 20 C.F.R. § 404.1505(a).[3] Social Security ALJs follow a five-step process to determine whether a

---

[3] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the date of the ALJ's written decision.

claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. § 404.1520(a)(4). The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

## II. Procedural History

Francine applied for DIB in June 2018, alleging disability because of spinal stenosis, neck stenosis, diabetes, spinal tumor at L2, arthritis of the lower spine, nerve problems in her buttocks, herniated discs in her neck and back, and incontinence. *See* Administrative Record ("R.") 140–41, 164. She alleged that she became disabled on January 1, 2017. R. 140. She was fifty-six years old, or a "person of advanced age" under the regulations, on her alleged onset date. R. 58. Disability Determination Services ("DDS"), the state agency, denied her claim initially in September 2018, R. 58–69, and upon reconsideration in April 2019, R. 71–84. In January 2020, Francine appeared with counsel and testified at an administrative hearing before ALJ Brian Rippel. *See* R. 32–57. A vocational expert ("VE") also testified at this hearing. *See* R. 51–55.

ALJ Rippel issued an unfavorable decision on February 12, 2020. *See* R. 15–25. He found Francine had not engaged in substantial gainful activity since January 1, 2017, her alleged onset date. R. 17. Francine had "severe" medically determinable impairments ("MDIs") of degenerative disc disease of the cervical spine, radiculopathy of the left lower extremity, and

obesity. *Id.* Her other MDIs, including a benign tumor on the lumbar spine, were "non-severe" in part because they did not cause "any continuous exertional or non-exertional functional limitations." R. 17–18. None of her "severe" impairments met or medically equaled a relevant Listing. R. 18–20 (citing 20 C.F.R. pt. 404, subpt. P, app. 1 §§ 1.02, 1.04).

ALJ Rippel then evaluated Francine's residual functional capacity ("RFC") and determined she could perform "light" work[4] except that she could occasionally climb stairs and ramps, balance, stoop, kneel, crouch, and crawl; could never climb ladders, ropes, or scaffolds; and could tolerate only occasional exposure to cold extremes, vibration, and/or workplace hazards. R. 20. Based on this RFC finding and the VE's testimony, ALJ Rippel concluded that Francine could return to her past relevant work as a teacher aide as actually or generally performed. R. 24–25 (citing R. 52–53). Thus, he concluded that she was "not disabled" from January 1, 2017, through February 12, 2020. R. 25. The Appeals Council declined to review that decision, R. 1–6, and this appeal followed.

### III. Discussion

Francine challenges the ALJ's consideration of certain evidence in determining her RFC. *See generally* Pl.'s Br. 9–16, ECF No. 14. A claimant's RFC is his or her "maximum remaining ability to do sustained work activities in an ordinary work setting" for eight hours a day, five days a week despite his or her medical impairments and symptoms. SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (emphasis omitted). It is a factual finding "made by the [ALJ] based on all the relevant evidence in the case record," *Felton-Miller v. Astrue*, 459 F. App'x 226, 230–

---

[4] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). A person who can meet these relatively modest lifting requirements can perform "[t]he full range of light work" only if he or she can also "stand or walk for up to six hours per workday or sit 'most of the time with some pushing and pulling of arm or leg controls.'" *Neal v. Astrue*, Civ. No. JKS-09-2316, 2010 WL 1759582, at *2 (D. Md. Apr. 29, 2010) (quoting 20 C.F.R. § 404.1567(b)); SSR 83-10, 1983 WL 31251, at *5–6 (Jan. 1, 1983).

31 (4th Cir. 2011), and it should reflect specific, credibly established "restrictions caused by medical impairments and their related symptoms" that affect the claimant's "capacity to do work-related physical and mental activities," SSR 96-8p, 1996 WL 374184, at *1, *2. *See Mascio v. Colvin*, 780 F.3d 632, 637–40 (4th Cir. 2015); *Reece v. Colvin*, 7:14cv428, 2016 WL 658999, at *6–7 (W.D. Va. Jan. 25, 2016), *adopted by* 2016 WL 649889 (W.D. Va. Feb. 17, 2016). ALJs use a claimant's RFC to determine whether he or she can return to his or her past relevant work and, if not, whether he or she can transition to other, less demanding work existing in the national economy. *See Shinaberry v. Saul*, 952 F.3d 113, 119 (4th Cir. 2020); *Mascio*, 780 F.3d at 636.

The Commissioner "has specified the manner in which an ALJ should assess a claimant's RFC." *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019). First, because RFC is by definition "a function-by-function assessment based upon all of the relevant evidence of [the claimant's] ability to do work related activities," SSR 96-8p, 1996 WL 374184, at *3, the ALJ must identify each impairment-related functional limitation that is supported by the record, *see Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016). Second, the ALJ must provide a "narrative discussion describing" how specific medical facts and non-medical evidence "support[] each conclusion" in the RFC assessment, SSR 96-8p, 1996 WL 374184, at *7, and logically explaining how he or she weighed any conflicting or inconsistent evidence in arriving at those conclusions, *Thomas*, 916 F.3d at 311. Generally, a reviewing court will affirm the ALJ's RFC findings when the ALJ considered all the relevant evidence under the correct legal standards, *see Brown v. Comm'r of Soc. Sec. Admin.*, 873 F.3d 251, 268–72 (4th Cir. 2017), and built an "accurate and logical bridge from that evidence to his [or her] conclusion[s]," *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018). *See Thomas*, 916 F.3d at 311–12; *Patterson v.*

5

*Comm'r of Soc. Sec. Admin.*, 846 F.3d 656, 663–63 (4th Cir. 2017).

Francine makes two overarching arguments why substantial evidence does not support ALJ Rippel's RFC determination. Pl.'s Br. 1; *see generally id.* at 9–15 (pain and subjective limitations); *id.* at 16 (use of cane). First, she challenges the ALJ's summary of MRI results from August 2016, as well as some (but not all) of his reasons for finding that, although Francine's MDIs could reasonably be expected to cause her allegedly debilitating neck pain and lower-extremity symptoms, her statements describing those symptoms' intensity, persistence, and limiting effects were "inconsistent" with other relevant evidence in the record. Pl.'s Br. 9–15 (citing R. 22–23, 48, 289, 290–95, 388, 487, 503); *see* R. 20–21, 22–23 (citing R. 44–49, 289, 290–95, 334, 337, 341, 349, 359, 361, 372–73, 377, 380, 388, 393, 404, 421–22, 424, 427, 473, 488, 500–01, 503, 505–06, 508–10, 517–18, 520–21, 523–24, 528, 530–31, 545–46, 552–55, 559, 564, 568). Second, Francine argues that ALJ Rippel did not "consider whether [her] use of a cane is medically necessary" and, as such, his failure to include the use of a cane in his RFC finding was legal error. *See* Pl.'s Br. 1, 16. Her arguments are not persuasive.

*A.    Summary*

In August 2016, Francine underwent an MRI of her full spine to assess persistent lower-back pain radiating into both buttocks and legs and "subjective" lower-extremity weakness bilaterally. R. 289–90 (Aug. 11, 2016). As relevant here, the cervical MRI showed multilevel "mild" to "severe" foraminal stenosis and facet atrophy, including "severe" right foraminal stenosis at C3-C4, "[m]oderate to severe" spinal canal stenosis at C4-C5 and C5-C6, and "[d]iscogenic endplate degenerative changes most pronounced at C4-5" with otherwise "normal" marrow signal. R. 295. The radiologist who reviewed these results noted her impression: "No abnormal enhancement or mass within the cervical spine"; and "[m]ultilevel degenerative disc

disease, facet arthropathy, and uncovertebral spurring with varying degrees of spinal canal and foraminal stenosis . . . most advanced at C4-C5 and C5-C6." R. 294. Francine's thoracic MRI showed "[m]ultilevel disc desiccation and height loss with diffuse disc bulges most pronounced at T7-8 where there is partial effacement of the right ventral cord and mild canal stenosis," but "[n]o foraminal stenosis" or "abnormal enhancement." R. 296. Her lumbar MRI showed an intradural lesion within the cauda equina likely "represent[ing] a . . . nerve sheath tumor" and "[m]ild degenerative changes most pronounced at L4-L5," but "[n]o high grade canal or foraminal stenosis." R. 295. Findings on Francine's contemporaneous neurophysical exam were normal, including a "[s]table gait without assistive devices," full strength in both lower extremities, and negative straight leg raising test. R. 289–90.

Hamid Hassanzadeh, M.D., later explained to Francine that the "mild" degenerative changes in her lumbar spine were "not indicative of surgery," but that he suspected a nerve sheath tumor was "the primary contributor to her low back" pain and lower-extremity symptoms. *See* R. 290 (Aug. 12, 2016). He referred Francine to Greg Helm, M.D., a neurosurgeon who specialized in treating intradural tumors. *Id.*; *see* R. 288. As for Francine's cervical spinal stenosis, Dr. Hassanzadeh "recommended [continued] close monitoring given that she d[id] not show any signs of myelopathy at th[at] time," and he instructed Francine to follow-up if she noticed "the symptoms of myelopathy including ataxia, hand dexterity dysfunction, and bowel or bladder dysfunction." R. 290. He did not note any concerns or treatment specific to her "mild" degenerative disc disease of the thoracic spine. *See id.* ("Weight reduction + nonoperative management to ameliorate back pain. PT (to include aqua therapy) for core and low back strengthening. Prescription provided. We explained that a strong core provides the spine with natural stability and thereby slows the progression of inevitable degeneration.").

7

On August 25, 2016, Dr. Helm noted that Francine would be scheduled for "an L2 laminectomy and tumor recission . . . . once she has been approved for financial assistance at UVA." R. 289. Francine was "still in the process of obtaining financial assistance" four weeks later. R. 288. On September 25, she told Dr. Helm's nurse that she was "thinking about waiting until the spring" to have surgery, which was a few months beyond Dr. Helm's recommended timeframe. *Id.* ("She states Dr. Helm suggested she have surgery within 4 months – she is thinking about waiting until the spring, which would be about 7 months and would like me to ask Dr. Helm his thoughts on that."). "She also mentioned trying a certain herbal tea to treat her lesion." *Id.* The nurse "did not offer an opinion on that[,] other than to say [she] doubted [it] would treat the lesion." *Id.* After speaking with Dr. Helm, the nurse told Francine that he did "not recommend waiting longer than 4 months or so" to have surgery. *Id.* Francine sought a second opinion from Mark Roy, M.D., who agreed that resecting the benign tumor "was the most important thing to do." R. 266 (Nov. 8, 2016). Francine also asked Dr. Roy "about using herbs," but he "did not think this was a good idea" because the "tumor [would] eventually cause her significant neurological deficit" if not properly treated. *Id.* On exam, Francine had normal sensation and full motor strength throughout, but was "areflexic in the lower extremities." R. 265. She denied balance or coordination difficulties, gait abnormality, and weakness. R. 266. She was taking 400mg ibuprofen three times a day for pain. R. 265.

An MRI taken in September 2017 showed the tumor at L2 was "unchanged in size." *See* R. 287. At the time, Dr. Helm told Francine that "she may either opt for surgery to resect, or watch and repeat MRI in one year." *Id.* Francine decided to wait on surgery, noting that her "symptoms [were] maybe slightly better, [with] no numbness or weakness" and only "some pain esp[ecially] after standing for long periods." *Id.*; *see* R. 64 ("A recent MRI of the lumbar spine

showed a stable lesion at the mid L2 vertebral body for which she opted not to have surgery."). A

nurse who spoke to Francine on September 19, 2017, "believe[d] she ha[d] insurance now." R.

287; *see* R. 286–87 ("She has requested to repeat MRI in December since she will be losing her

insurance.") (Oct. 31, 2017). Francine called Dr. Helm's clinic two more times to ask about

medication that she believed would shrink her tumor. R. 287 ("She has heard about a medication

she would like to try and wants to discuss with him. She will not speak with anyone but him, and

will not tell me which med.") (Sept. 28, 2017); *id.* ("She would like to discuss possible

medication to shrink her tumor.") (Oct. 28, 2017). On October 31, Dr. Helm told Francine he

was "not aware of any medication," and that she needed to follow-up with her primary care

provider "for long term pain management." R. 286. Other providers' progress notes show

Francine mentioned "herbal" or "homeopathic" remedies to treat her tumor at clinic visits in

2016 and 2017. *See, e.g.*, R. 276 ("Is interested in trying some herbal medications that she has

read about to shrink the tumor.") (Sept. 21, 2016); R. 388 ("[S]he does want to try some

homeopathic remedies and plans to start taking herb called 'yellow doc.' Patient states this

medication is known to shrink tumors.") (Nov. 1, 2017).

   As of January 2019, the tumor "appear[ed] stable in size compared to prior studies since .

. . 2016," and "[n]o additional spinal canal mass lesion [was] detected." R. 413 (Jan. 11, 2019).

That May, Dr. Helm noted Francine still had "low back pain" that "var[ied] in nature" and that

they "may need to consider surgery" if her symptoms did "not improve" after an L4-5 epidural

steroid injection. R. 462. Francine "did not take the steroid shot that pain management

recommended." R. 516. On January 14, 2020, Francine told a new physician that Dr. Helm had

"at one time . . . wanted to have the tumor removed, but this couldn't be done due to insurance

issues, and serial MRIs were decided as [a] treatment plan." R. 552. Two weeks later, Francine

testified that her doctors "did recommend surgery, but at that time [she] didn't really have coverage and [she] couldn't go forward with the surgery." R. 44 ("Q. So you didn't have insurance to go forward with the surgery." "A. Right."). *But see* R. 47 ("I was ready to have surgery because I was in so much pain in the spring, but the doctor wanted me to wait. He says there's a lot of risk involved in the surgery . . . . I could get paralyzed from the surgery or I could get paralyzed [from] not having the surgery[.]"). She did not say whether she ever completed the financial-aid process referenced in Dr. Helm's August 2016 treatment note. R. 44, 288–89.

Francine's doctors also referred her to physical therapy, prescribed pain medication, gave therapeutic injections, and encouraged her to exercise. *See, e.g.*, R. 274, 278, 290, 330, 348, 380, 404, 421–22, 427, 462, 487, 516–18. In September 2018, Francine "became very upset" when a physician said that she needed "urine drug testing before prescribing narcotics." R. 337. She told the doctor that she was an "ordained minister" who "d[id] not do drugs" or drink alcohol and "she [did] not like to take medications." *Id.* Francine also gave "some vague answers" when "asked if she has had any problems with her neck or back." R. 340. She was prescribed NSAIDs and narcotics for her back and neck pain throughout the relevant time, *see, e.g.*, R. 348, 371, 375, 388, 396, 426, 501, 510, but she later "refused" to take NSAIDs, R. 516, 519; *see also* R. 426 ("She is not taking any anti-inflammatories because somebody told her it might make her blood sugars go up."); R. 545 ("Informed patient that I cannot refill narcotic medications that she is request[ing]") (Oct. 30, 2019). In June 2019, Francine asked to attend PT for her neck pain because it was "working well" for her back pain. R. 512. Two months later, Francine's doctor received a note that "she was discharged from . . . physical therapy for her behavior." R. 503 (Aug. 5, 2019). Francine denied any problems and said that she needed a new prescription to continue PT on her neck and back. *Id.* She also wanted to try therapeutic massage and

chiropractic treatments. R. 505. When her doctor encouraged Francine to try PT again, she became "very combative" and "aggressive[,] . . . stating she had in fact completed physical therapy." *Id.* The physician also deferred Francine's repeated requests for a cane, R. 503, 505, because Francine did "not qualify for a cane" and the physician did not have time that day "to complete a detailed assessment to see if she would qualify," R. 506. A physician's assistant at a different clinic prescribed a cane at Francine's request in August 2019. R. 487 ("She requested a prescription for a cane and was given this."). Francine walked "without difficulty" and had full range of motion on that day's exam. R. 488.

     Neurophysical exams throughout the relevant period consistently revealed normal gait, R. 341, 359, 361, 373, 377, 380, 393, 427, 473, 488, 523, 528, 531, 546; *see also* R. 503 ("She admits that generally she does not have a problem with ambulation but there are a few instances where the sciatica causes her to limp."); full range of motion in the lumbar spine and/or lower extremities, *see* R. 341, 349, 393, 488, 501, 510, 517, 521, 559, 564, 568; full range of motion in the cervical spine and/or upper extremities, *see* R. 341, 359, 397, 488, 501, 510, 517, 521, 559, 564, 568, normal strength throughout, *see* R. 349, 422, 427, 473, 501, 510, 517–18, 521, 546, 554, 559, 564, 568; no pain or tenderness to palpation, *see* R. 341, 501, 510, 517, 521, 559, 564, 568; intact sensation, *see* R. 421–22, 427, 517, 521, 559; and negative straight-leg tests, R. 277, 341, 427. A handful of abnormal findings—such as "palpable tenderness on the left sciatic nerve," R. 349; "painful" flexion and extension of the cervical spine, R. 359; and "paraspinous muscle spasm and tenderness over thoracic vertebra," R. 361—typically followed car accidents or other acute events. *See* R. 349 (Sept. 28, 2018); R. 359 (July 1, 2018); R. 361 (Aug. 12, 2017).

\*

ALJ Rippel discussed much of this and other relevant evidence throughout his written decision. *See* R. 17–25. He found that Francine's degenerative disc disease of the cervical spine and radiculopathy of the left lower extremity were "severe" impairments, R. 17, but they did not meet or equal the relevant Listings because physical examinations consistently showed "normal gait and posture, normal ambulation, normal strength in the lower extremities, normal movement of the extremities . . . and normal sensation," R. 19. The cervical MRI from August 2016 showed "multilevel degenerative disc disease . . . with varying degrees of spinal canal and foraminal stenosis most advance[d] at C4-C5 and C5-C6," but "no abnormal enhancement of [sic] mass within the cervical spine." R. 19 (citing R. 290–95). He did not specifically mention the "moderate" to "severe" stenosis at C3-C4 through C5-C6 or the "partial effacement of the right ventral cord and mild canal stenosis" at T7-T8. *See* R. 295–96. ALJ Rippel also found that Francine's benign nerve sheath tumor at L2 was a "non-severe" MDI because, despite multiple physicians' insistence that Francine needed a laminectomy or the tumor "will eventually cause her significant neurological deficits," this impairment had "not required significant medical treatment" or "resulted in any continuous exertional or non-exertional functional limitations" during the relevant time. R. 18. Indeed, Francine told doctors that she "preferred to pursue homeopathic remedies" for the tumor. R. 23 (citing R. 388).

Before evaluating Francine's RFC, the ALJ summarized her medical records, R. 21–23, as well as her testimony that she cannot "work because it is difficult to sit down for long or short periods," she has "burning in her lower back and discomfort in her buttock area," the tumors and herniated discs in her neck made it "difficult" to turn her head and lie down, she can lift fewer than "10 pounds comfortably," she walks with a limp, and she "can stand [for] a couple of minutes [or] sometimes longer," R. 20–21 (citing R. 44–49). ALJ Rippel also noted Francine's

testimony that "she did not have insurance coverage, so [she] could not go forward" with the recommended surgery on her nerve sheath tumor. *Id.* (citing R. 44). He found that Francine's MDIs "could reasonably be expected to cause" her alleged neck, back, and lower-extremity symptoms, but that her statements describing those symptoms' intensity, persistence, and limiting effects were "not entirely consistent" with the medical and other relevant evidence in her record. R. 22–23. More specifically, Francine's treatment for cervical DDD and lumbar radiculopathy consisted of "referrals to physical therapy, a brace, and medications," R. 23 (citations omitted), which was a "routine, conservative, and unremarkable" regimen for allegedly disabling pain, *see id.* ALJ Rippel also noted that Francine initially balked at taking a urine drug screen before her doctor could prescribe narcotics, but that she later received or requested prescriptions for multiple narcotic pain relievers. R. 23. In August 2019, Francine's doctor "received notice that she was discharged from physical therapy due to her behavior." *Id.* (citing R. 503). Francine also "declined" physicians' recommendations that she have "a laminectomy to address [the] benign sheath tumor, preferring a homeopathic approach" instead. *Id.* (citing R. 388). Finally, physical exams "consistently" showed Francine had a normal gait, posture, strength, reflexes, and sensation. *Id.* Abnormal findings were "minimal," *see* R. 23, and generally limited to "painful" but full range of motion in the neck, back, or legs, *see* R. 21 (citing R. 337, 358–59). Ultimately, ALJ Rippel found that Francine could lift and/or carry up to twenty pounds occasionally and ten pounds frequently; stand and/or walk and sit for "up to 6 hours" each in an eight-hour workday; occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, but never climb ladders, ropes, or scaffolds; and tolerate occasional exposure to "cold extremes, vibration, and/or workplace hazards." R. 20; *see* R. 24 (citing R. 63–65, 79–81). She did not need to use a cane. *See* R. 20.

*B.      Analysis*

Francine challenges several aspects of ALJ Rippel's RFC assessment: (1) his summary of

the MRI results from August 2016, in which he purportedly "ignored" the more specific findings

of "moderate" to "severe" stenosis at C3 through C6 and "partial effacement" of the right ventral

cord at T7-T8, *see* Pl.'s Br. 10–11 ("Since it is easily conceivable that even minimal compression

of the spinal cord could produce excruciating pain, the ALJ's failure to consider effacement at

T7-T8 was glaring legal error."); (2) his decisions to reject Francine's testimony that she

deferred recommended surgery because "she did not have insurance coverage," and to instead

credit other evidence that Francine declined the laminectomy because she preferred homeopathic

remedies, *see id.* at 11–12; (3) his purported finding that Francine's treatment for her lower-back

pain was "routine, conservative, and unremarkable," *id.* at 12 ("But for [Francine's] poverty, her

treatment would not have been 'routine, conservative, and unremarkable'—assuming *arguendo*

that it was to begin with."); (4) his findings that Francine made inconsistent statements about

taking narcotic pain relievers, and that those inconsistencies undermined her complaints of

disabling neck pain, *id.* at 14 ("What she meant, *of course*, was that she did not 'do drugs'

illegally; her becoming 'very upset' was an expression of indignance at the physician's

suggestion that she, a minister, would do such a thing."); (5) his failure to mention Francine's

testimony describing her "quite limited" activities of daily living when evaluating her subjective

complaints of pain and limitations, *id.* at 12–13 (citing R. 48); and (6) his failure to "consider

whether [Francine's] use of a cane is medically necessary," *id.* at 16.

*1.      Francine's Symptoms*

Most of Francine's arguments attack ALJ Rippel's evaluation of her symptoms. *See*

*generally* Pl.'s Br. 1, 9–15. "Symptoms," or the claimant's own description of her medical

14

impairment(s), 20 C.F.R. § 404.1502(i), play a crucial role in a proper RFC determination,
*Mascio*, 780 F.3d at 639–40. The regulations set out a two-step process for evaluating claimants'
symptoms. *Lewis*, 858 F.3d at 865–66; 20 C.F.R. § 404.1529. "First, the ALJ looks for objective
medical evidence showing a condition that could reasonably produce the alleged symptoms,"
*Lewis*, 858 F.3d at 866, "in the amount and degree[] alleged by the claimant," *Craig v. Chater*,
76 F.3d 585, 594 (4th Cir. 1996). Second, assuming the claimant clears the first step, "the ALJ
must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to
determine the extent to which they limit the claimant's ability," *Lewis*, 858 F.3d at 866, to work
on a regular and continuing basis, *Mascio*, 780 F.3d at 637; *Hines*, 453 F.3d at 565. "The second
[step] requires the ALJ to assess the credibility of [subjective] statements about symptoms and
their functional effects," *Lewis*, 858 F.3d at 866, after considering all relevant evidence in the
record, 20 C.F.R. § 404.1529(c). The ALJ must give specific reasons, supported by "references
to the evidence," for the weight assigned to the claimant's statements. *Edwards v. Colvin*, No.
4:13cv1, 2013 WL 5720337, at *6 (W.D. Va. Oct. 21, 2013) (citing SSR 96-7p, 1996 WL
374186, at *2, *4–5 (July 2, 1996)). A reviewing court will uphold the ALJ's credibility
determination if his or her articulated rationale is legally adequate and supported by substantial
evidence in the record. *See Bishop v. Comm'r of Soc. Sec.*, 583 F. App'x 65, 68 (4th Cir. 2014)
(citing *Eldeco, Inc. v. NLRB*, 132 F.32 1007, 1011 (4th Cir. 1997)); *Hines*, 453 F.3d at 565–66.

ALJ Rippel satisfied this deferential standard of review. Francine first argues that ALJ
Rippel erred at the second step by ignoring findings from her August 2016 MRI. Pl.'s Br. 10.
ALJ Rippel explicitly considered Francine's August 2016 MRI within his decision. R. 21. He
noted that the MRI demonstrated "no abnormal enhancement o[r] mass within the cervical spine;
and multilevel degenerative disc disease, facet arthropathy, and uncovertebral spurring with

varying degrees of spinal canal and foraminal stenosis most advance[d] at C4-C5." *Id.* This language comes directly from the reviewing radiologist's recorded "Impression" of the cervical MRI results. R. 294 ("No abnormal enhancement or mass within the cervical spine. Multilevel degenerative disc disease, facet arthropathy, and uncovertebral spurring with varying degrees of spinal canal and foraminal stenosis . . . most advanced at C4-C5 and C5-C6.").

Francine contends that the ALJ's description "fails to convey any cognizance of what that MRI actually showed," and demonstrates that he "failed to read beyond the summary Impressions." Pl.'s Br. 10. According to Francine, the ALJ's general statement that she had "varying degrees of spinal canal and foraminal stenosis" shows that the ALJ "did not expressly consider the fact that [Francine] has severe stenosis at two levels and moderate to severe stenosis at another level." *Id.*; *see also id.* at 3, 6, 10. Further, Francine argues the ALJ "failed to mention that at T7-8 there was partial effacement of the right ventral cord," *id.*, and that "[s]ince it is easily conceivable that even minimal compression of the spinal cord could produce excruciating pain, the ALJ's failure to consider effacement at T7-T8 was glaring legal error," *id.* at 11.

To start, an ALJ is not required to mention each and every finding contained in the record. *Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014) ("[T]here is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision." (quoting *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005))). And, where the ALJ says he considered certain evidence, and the record does not contradict the ALJ's assertion, the Fourth Circuit instructs district courts to take the ALJ at his word. *Id.* ("The Commissioner, through the ALJ and Appeals Council, stated that the whole record was considered, and, absent evidence to the contrary, we take her at her word."). Here, ALJ Rippel stated within his decision that he

reached his conclusion as to Francine's RFC "[a]fter careful consideration of the evidence," R. 22, and there is nothing in the record contradicting this assertion here.

ALJ Rippel not only explicitly considered Francine's August 2016 MRI, his description of that imaging is also consistent with the impression of Jennifer Pierce, M.D., who interpreted the MRI. *See* R. 294. And, although Francine contends that this demonstrates that the ALJ did not look beyond the impression, such a conclusion is not warranted. ALJ Rippel's reliance on the impression does not necessarily indicate that he ignored the more specific findings of "moderate" to "severe" stenosis as Francine suggests; instead, it demonstrates that, rather than attempting to interpret those medical findings for himself, he reasonably relied on the judgment of the attending physician regarding what that MRI represented. *Compare Harvey v. Comm'r of Soc. Sec.*, No. 9:20cv135, 2021 WL 3410758, at *6 (D.S.C. May 18, 2021) ("[T]he ALJ relied on the physician's interpretations of the data, and then used those interpretations in formulating Harvey's RFC—precisely what the regulations contemplate." (citing 20 C.F.R. § 404.1545(a)(1), (a)(3))), *with Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83, 108–09 (4th Cir. 2020) ("Because the ALJ lacked the medical expertise to interpret a cervical MRI, he erred in discounting" physician's medical opinion that claimant's "'cervical MRI showed clear evidence of chronic cervical spasm'" and "improperly substituted his own opinion" that "'an MRI would not document a chronic condition of spasm'"). Moreover, Francine does not explain how more specific findings of "moderate" to "severe" stenosis would alter the ALJ's finding that Francine's complaints of disabling neck pain were not entirely consistent with other relevant evidence in the record. At best, these findings demonstrate the existence of medically determinable impairments *reasonably likely to produce* Francine's allegedly "excruciating" neck pain, which ALJ Rippel already found supported by the objective medical evidence. R. 22

("After careful consideration of the evidence, the undersigned finds that that claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms . . ."). They do not, however, make Francine's subjective statements regarding her symptoms from such impairments any more credible. *Cf. Felton-Miller*, 459 F. App'x at 230 ("Felton–Miller's sarcoidosis diagnosis, without more, does not establish that she suffers from any particular symptoms or limitations."). And, although Francine asserts that the partial effacement at T7-8 "*could* produce excruciating pain," Pl.'s Br. 11 (emphasis added), she did not allege that this abnormality *actually* causes her disabling pain. Accordingly, I find no error in the ALJ's consideration of Francine's August 2016 MRI or his not expressly mentioning the effacement at T7-8.

Francine next argues that the ALJ erred by discrediting her testimony that she could not undergo surgery to have her lumbar nerve sheath tumor removed, despite multiple physicians' recommendations to do so, because she "didn't really have coverage and [she] couldn't go forward with that." Pl.'s Br. 11; R. 44. Francine contends that the record demonstrates this surgery was contingent upon approval of financial assistance from UVA Health System, Pl.'s Br. 11, and that the evidence "easily supports the conclusion that [Francine] was *not* approved for financing," *id.* at 12. *See Lovejoy v. Heckler*, 790 F.2d 1114, 1117 (4th Cir. 1986) ("A claimant may not be penalized for failing to seek treatment she cannot afford."); SSR 18-3p, 2018 WL 4945641, at *5 (Oct. 29, 2018) (explaining that an ALJ cannot penalize a claimant for failing to follow treatment if the claimant establishes that he or she is "unable to afford prescribed treatment, which he or she is willing to follow, but for which affordable or free community resources are unavailable"). The ALJ found that Francine "declined a laminectomy to address a

benign nerve sheath tumor, preferring a homeopathic approach." R. 23 (citing R. 388). This conclusion is supported by substantial evidence.

The evidence of record demonstrates that an August 2016 lumbar MRI demonstrated the presence of a possible nerve sheath tumor. R. 295. When Francine complained to Dr. Hassanzadeh a few days later of lower back and lower extremity pain, he said he believed the "primary contributor" to her low back and bilateral lower-extremity symptoms was "a nerve sheath tumor in the lumbar spine," and her referred her to Dr. Helm. R. 290. On August 25, 2016, Francine saw Dr. Helm, who noted that Francine would be scheduled for "an L2 laminectomy and tumor recission," once UVA approved financial assistance. R. 289. Four weeks later, Francine was "still in the process of obtaining financial assistance," and was "thinking about waiting until the spring" to have her surgery, but she wanted Dr. Helm's thoughts opinion as he had recommended surgery within four months and spring was seven months out. R. 288. She also asked about an "herbal tea" to treat her lesion. *Id.* Dr. Helm did not recommend that Francine wait longer than four months to have the surgery. *Id.* Francine then sought a second opinion from Dr. Roy in November 2016, who opined that her tumor should be surgically resected. R. 266. Francine asked about treating the tumor with "herbs and other interventions," but Dr. Roy "did not think [that] was a good idea." *Id.* A September 2017 MRI showed the tumor was "unchanged in size," and Dr. Helm advised that Francine could opt for surgery or watch the tumor and perform another MRI in a year. R. 287. Francine elected to hold off on surgery, and a nurse in Dr. Helm's office "believe[d] she ha[d] insurance" at that point. *Id.* Francine later called Dr. Helm's office on two other occasions to inquire about alternative pharmacological remedies, of which Dr. Helm said he was unaware. *Id.* And, she similarly expressed a desire to pursue herbal or homeopathic remedies to other providers in 2016 and 2017. R. 276, 388. By January

2019, the tumor was "stable in size," R. 413, Dr. Helm noted that Francine may need to consider

surgery if an epidural steroid injection did not provide relief, R. 462, but Francine never got the

injection, R. 516. On January 14, 2020, Francine told a provider that Dr. Helm had once

recommended surgery for her tumor, "but this couldn't be done due to insurance issues, and

serial MRIs were decided as [a] treatment plan." R. 552. Two weeks later, Francine testified at

the administrative hearing that she was unable to have the recommended surgery because she

"didn't really" have insurance coverage. R. 44 ("Q. So you didn't have insurance to go forward

with the surgery." "A. Right."). *But see* R. 47 ("I was ready to have surgery because I was in so

much pain in the spring, but the doctor wanted me to wait. He says there's a lot of risk involved

in the surgery . . . . I could get paralyzed from the surgery or I could get paralyzed [from] not

having the surgery[.]").

        Based on this evidence, the ALJ reasonably found that Francine declined surgery in favor

of homeopathic remedies. He acknowledged Francine's testimony that she could not have the

surgery because she did not have insurance, R. 21–22, but the record demonstrates, and she

states in her brief, that her surgery was contingent upon UVA's approval of financial assistance.

R. 289. And, although Francine stated that she was in the process of obtaining financial

assistance in September 2016, she also stated at that time that she was considering delaying the

surgery beyond Dr. Helm's recommended timeframe. R. 288. Moreover, there is nothing in the

record to indicate that Francine was ever denied financial assistance, and she consistently

expressed an interest in treating her tumor with herbal or homeopathic remedies, as opposed to

surgery, despite her medical providers' recommendation that she have surgery. *See, e.g.*, R. 266,

276, 388. With these apparent conflicts between Francine's repeated statements to her providers

and Francine's testimony at the administrative hearing, ALJ Rippel reasonably determined that

20

Francine declined surgery not because she lacked insurance "coverage," as she testified, but because she wanted to try a homeopathic approach that her doctors did not recommend. *See Hancock*, 667 F.3d at 472 ("In reviewing for substantial evidence, we do not undertake to reweigh conflicting evidence, make credibility determinations, or substitute our judgment for that of the ALJ.") (cleaned up); *cf. Kelly v. Berryhill*, No. 5:15cv75, 2017 WL 1194716, at *5 n.6 (W.D. Va. Mar. 30, 2017) ("[T]he ALJ provided an adequate explanation for crediting Kelly's contemporaneous statements to her physicians, which described significant activities, over her claims at the hearing of greater functional limitation.). And, contrary to her suggestion, Pl.'s Br. 12, it was Francine's burden to demonstrate that she declined the surgery based on a lack of financial means, and she has not met that burden here, SSR 18-3p, 2018 WL 4945641, at *4 ("In adult claims, the individual has the burden to provide evidence showing that he or she has good cause for failing to follow prescribed treatment."). *Cf. Mabe v. Colvin*, No. 4:12cv52, 2013 WL 6055239, at *7 (W.D. Va. Nov. 15, 2013) ("Plaintiff did not present any evidence to suggest that his access to the free clinics was limited in any way. If Plaintiff had exhausted the availability of the clinics, evidence to that effect should have been presented."). Thus, substantial evidence supports the ALJ's finding that Francine declined the surgery in favor of homeopathic remedies, and I find that the ALJ did not err in relying on evidence that Francine declined to have her tumor surgically removed as a reason for discrediting her allegations regarding her pain.

Francine also contends that the ALJ failed to consider or account for her neck pain. In evaluating Francine's subjective allegations regarding her pain, the ALJ discussed imaging studies of Francine's neck as well as treatment notes that documented her report of symptoms and the medical providers' normal exam findings and treatment recommendations. R. 23. The ALJ also found that the treatment Francine received with respect to her cervical degenerative

disc disease and lumbar radiculopathy was "routine, conservative, and unremarkable." R. 23. He

observed that these conditions had "been treated with referrals to physical therapy, a brace, and

medications." *Id.* (citations omitted). Francine does not contend that ALJ Rippel erroneously

found these treatments to be "conservative," and I find that the ALJ reasonably concluded that

Francine underwent a "conservative" course of treatment and that such a course reasonably

called Francine's subjective statements regarding her disabling neck pain into question. *See, e.g.*,

*Gregory v. Colvin*, No. 4:15cv5, 2016 WL 3072202, at *5 (W.D. Va. May 6, 2016) ("It was

reasonable for the ALJ to characterize [Plaintiff's] course of treatment, consisting of pain

medication, physical therapy, and steroid injections, as 'conservative.'"), *adopted by* 2016 WL

3077935 (W.D. Va. May 31, 2016). Accordingly, I find no error in the ALJ's reliance on

imaging studies of Francine's neck, her treatment providers' exam findings, and her

"conservative" treatment as demonstrating that her symptoms were not as severe as she alleged.

     Francine further asserts that the ALJ erred by relying on "inconsistent statements" she

made to providers regarding her aversion to narcotic pain medications as a basis for discrediting

her alleged symptoms. In discrediting Francine's allegations, ALJ Rippel observed that Francine

told a medical provider she "[did] not drink or use drugs, and that she [did] not like to take

medication" after being told a urine drug screen needed to be performed before medications

could be prescribed. R. 23. He found this "inconsistent" with Francine's being prescribed and

requesting narcotics on later occasions. *Id.*

     There may be degree of inconsistency in Francine balking at a urine drug screen and

stating that she did not like to take medications, on the one hand, and later being prescribed and

requesting narcotic pain medications. It remains unclear, however, why this seemingly trivial

inconsistency makes Francine's testimony regarding her symptoms less credible. *Cf. Testamark*

*v. Berryhill*, 736 F. App'x 395, 399 (4th Cir. 2018) (faulting the ALJ for relying on "trivial inconsistencies" as a basis for rejecting medical opinions). ALJ Rippel appears to have reasoned that this about-face demonstrated a certain degree of untrustworthiness in Francine's statements regarding her impairments, but it also may have been a simple change of heart. Nonetheless, ALJ Rippel reasonably relied on Francine's "conservative" treatment as one factor demonstrating that her subjective statements regarding her symptoms were not entirely credible, and thus his additional reliance on her "inconsistent statements" was merely superfluous. As such, any error in his characterization Francine's statements is harmless. *See Kersey v. Astrue*, 614 F. Supp. 2d 679, 696 (W.D. Va. 2009) ("Errors are harmless in social security cases when it is inconceivable that a different administrative conclusion would have been reached absent the same error.").

Next, Francine argues that ALJ Rippel erred by not considering the limits Francine testified she had in performing her activities of daily living. Pl.'s Br. 12–13. Specifically, she contends that it is unclear whether the ALJ accepted or rejected her testimony as to these limits. *Id.* Francine indeed testified that she is limited in her daily activities. R. 48 (Francine testifying that she could "not really" cook or clean during the relevant period and typically only made frozen meals). The ALJ did not explicitly mention this evidence, as Francine points out. Nonetheless, the ALJ was not required to recite every aspect of the claimant's testimony, so long as it is sufficiently clear that he "considered" any testimony relevant to the disability determination. Moreover, this case is distinguishable from those like the Fourth Circuit's decision in *Woods v. Berryhill*, 888 F.3d 666 (4th Cir. 2018), where the Fourth Circuit remanded the case because the ALJ relied on the claimant's ability to perform certain daily activities as a basis for discounting her subjective statements regarding her symptoms without also considering the limited extent to which she testified she could perform those activities. *Id.* at 694 ("An ALJ

23

may not consider the *type* of activities a claimant can perform without also considering the *extent* to which she can perform them."). Unlike the ALJ in *Woods*, ALJ Rippel did not cite to Francine's ability to perform activities of daily living as a reason for rejecting or discounting her subjective statements regarding her pain. As such, he did not necessarily need to satisfy the additional requirement that he also consider the "limited" extent to which she testified she could perform such activities. *See Mascio*, 780 F.3d at 640 (noting that the ALJ should "explain how he decided which of [the claimant's] statements to believe and which to discredit" when necessary to permit meaningful judicial review). Moreover, Francine's self-described "quite limited" daily activities, Pl.'s Br. 12–13, "are, in effect, an extension of her claim that her debilitating pain renders her unable to sit, stand, walk, or work for prolonged periods," *Jesse v. Kijakazi*, No. 1:20cv288, 2021 WL 4305770, at *4 (S.D. W. Va. Sept. 22, 2021). "Substantial evidence supports the ALJ's decision not to credit that claim," *id.*, for the reasons explained above. Accordingly, I find no error in the ALJ not having explicitly noted Francine's testimony regarding the limitations she has in her ability to perform activities of daily living. *Cf. Sutton v. Berryhill*, No. 2:16cv741, 2017 WL 6803521, at *8 (E.D. Va. Dec. 17, 2017) ("[T]he ALJ's mere failure to mention Sutton's [strong] work history explicitly does not warrant remand or reversal in the face of his otherwise supported findings.").

2.    *Use of a Cane*

Lastly, Francine argues that although the ALJ recognized that she had been prescribed a cane, he did not properly assess the impact that her "use of a cane" had on her ability to perform full-time work. Pl.'s Br. 16 (citing R. 22, 487). "Social Security Ruling 96-9p requires an ALJ to consider the impact of medically required hand-held devices, such as a cane or walker, when evaluating the claimant's RFC." *Candi L. v. Comm'r of Soc. Sec.*, No. 4:17cv30, 2018 WL

24

7690318, at *8 (W.D. Va. July 31, 2018) (internal quotation marks omitted), *adopted*, 2019 WL

1264890, at *3–5 (W.D. Va. Mar. 19, 2019), *and aff'd*, 808 F. App'x 210, 211 (4th Cir. 2020);

*see* SSR 96-9p, 1996 WL 374185, at *7 (July 2, 1996). "To find that a hand-held assistive device

is medically required, there must be medical documentation establishing the need for a hand-held

assistive device to aid in walking or standing and describing the circumstances for which it is

needed." SSR 96-9p, 1996 WL 374185, at *7. "The claimant bears the burden to show that her

use of a particular hand-held assistive device to perform work-related functions is in fact

medically necessary and therefore should have been included in the RFC finding." *Candi L.*,

2018 WL 7690318, at *8.

Though the record does show that Francine was prescribed a cane, she has failed to meet

her burden of establishing that her cane was "medically necessary" as that term is defined in the

regulations. Even assuming that her having been prescribed a cane upon requesting one

constitutes "medical documentation establishing the need for a hand-held assistive device to aid

in walking or standing," Francine still has not offered any evidence "describing the

circumstances for which it is needed." SSR 96-9p, 1996 WL 374185, at *7. Indeed, with respect

to Francine's cane, the only documentation of record establishes that she requested it in August

2019, stating "that she generally does not have a problem with ambulation but there are a few

instances where the sciatica causes her to limp," and she had been using a cane at home "as

needed." R. 503. It was noted that she did not qualify for a cane, and she would need to return for

a full medical assessment before a cane could be prescribed. R. 505. About a week later, she

again requested a cane and was prescribed one by Rebecca Evans, P.A. R. 487. Other than to say

that Francine requested, and was given, a cane, P.A. Evans's notes provide no detail as to the

circumstances in which Francine needed the cane. As such, Francine has failed to meet her

burden of establishing that her cane was "medically necessary," and thus the ALJ did not err by not accounting for it in his RFC analysis. *See Brewer v. Astrue*, No. 5:11cv106, 2012 WL 405090, at *2 (N.D. W. Va. Feb. 8, 2012) ("Although the plaintiff may have been prescribed a cane, this Court finds that there is other evidence in the record indicating that a cane was not medically required and that the plaintiff did not consistently use a cane to walk."); *Scott v. Berryhill*, No. 4:17cv42, 2018 WL 4939268, at *4 (E.D.N.C. July 5, 2018) ("Because Scott has failed to carry her burden of establishing her use of an assistive device was medically required, the undersigned cannot find that ALJ Hall erred failing to include the use of a cane in her RFC determination for a reduced range of light work.").

## IV. Conclusion

For the foregoing reasons, I respectfully recommend that the presiding District Judge **DENY** Francine's Motion for Summary Judgment, ECF No. 13, **GRANT** the Commissioner's Motion for Summary Judgment, ECF No. 15, **AFFIRM** the Commissioner's final decision, and **DISMISS** this case from the Court's active docket.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the presiding District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

ENTER: February 18, 2022

Joel C. Hoppe
United States Magistrate Judge